# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

JAMES E. ENDTRICHT, ET AL.,

     Plaintiffs,

v.

UNITED STATES OF AMERICA

     Defendant.

Case No: 03-CV-0073 TUC RCC (BPV)

**REPORT AND RECOMMENDATION**

Defendant brings this motion, (Document #95) pursuant to Rule 56, Federal Rules of Civil Procedure, for an order granting summary judgment to the Defendant and dismissal of the complaint with prejudice.

On March 3, 2003, this case was referred to Magistrate Judge Carruth, and on March 25, 2005, due to the retirement of Magistrate Judge Carruth, it was randomly reassigned to Magistrate Judge Velasco for all pretrial proceedings and report and recommendation.  On August 18, 2006, Magistrate Judge Velasco heard arguments on Defendant United States of America's Motion for Summary Judgment (Document # 95).  For reasons which follow, the Magistrate Judge recommends that the District Court, after its independent review, grant Defendant United States of America's Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

On January 31, 2003, Plaintiffs James and Diane Endtricht filed a complaint for damages under the Federal Tort Claims Act (FTCA), alleging medical malpractice, pursuant to

28 U.S.C. §§2671-2680. (Document #1.) On June 2, 2003, Defendant filed a motion to dismiss Plaintiff Dianna Endtricht. (Document #6.) Judge Collins granted the motion on September 18, 2003. (Document #13.) A year later, on March 30, 2006 Defendant filed a motion for summary judgment (Document #95). Plaintiff filed a response in opposition on May 19, 2006 (Document #109.). Defendant filed a reply on June 02, 2006. (Document #113.) Magistrate Judge Velasco held a hearing on August 18, 2006 on the motion for summary judgment and issued an oral order taking the motion under advisement.

## STATEMENT OF FACTS[1]

Plaintiff James Endtricht is a 61 year-old man with a history of medical problems relating to his back, neck, and cervical spine. (Plaintiff's Statement of Facts ("PSOF") 10, 16.) From 1985 to March 2000, Plaintiff has had at least four documented accidents related to his neck and back. (PSOF 11.) After the last injury, Plaintiff was dragging his foot and suffered intense pain on the left side of his neck. Prior to the last injury, Plaintiff had already had four other operations on his neck, and the Social Security Administration had declared him 100% and permanently disabled, mainly due to his neck and back. (PSOF 11, 15, 17.)

With this history, Plaintiff was taken to see Dr. Martin Weinand at the Tucson VA Medical Center for treatment. Dr. Weinand diagnosed Plaintiff with multiple levels of cervical stenosis, which is a narrowing of the spinal canal in the area of the neck. Plaintiff also had significant compression at the C6-C7 level of his spine, due to an osteophyte, which is a bony

---

[1] Where the facts are essentially uncontested, they will not be referenced. When a dispute as to the facts is present and relevant, the factual reference will be noted.

structure that had formed on the vertebral body in the area of Plaintiff's neck.  The osteophyte was in the front ("ventral") part of the spinal column.  (PSOF 18-22.)

Dr. Weinand, a Board Certified Neurosurgeon on staff at the Tucson VA, recommended surgery to decompress the C6-C7 spinal area.  (PSOF 4, 9.)   Dr. Weinand planned to decompress the area by removing part of the osteophyte.  Before the surgery (Plaintiff's fifth), Plaintiff was in a wheelchair, had an acute weakness in his left lower extremity, and some weakness in his right lower extremity; he also had "increased weakness in his upper extremities." (Exhibit 2, Excerpt 103.)  He also complained of "loss of sensation to pain in both lower extremities all the way up to his umbilicus."  (PSOF 29-30.)  He also had bowel and bladder control problems.  (Exhibit 18, page 2).

Prior to the surgery, Plaintiff was also told that the risks associated with the surgery were no improvement in pain or sensation, some improvement, or a possible decline into further pain or numbness.  Plaintiff acknowledged that he understood these risks.  (PSOF 31, 77.)

On May 16, 2000, Dr. Weinand operated on Plaintiff's spinal cord, removed some of the osteophyte, and decompressed the C6-C7 spinal area from 10mm to 3.5mm.  (PSOF 38-39.)  This decompression should have put the cervical canal within normal ranges.  (PSOF 23-24.)  After the surgery, Plaintiff's legs were stronger.  Unfortunately, 5 to 10 days later, Plaintiff began experiencing the same problems again, this time with bilateral lower extremity weakness, and increasing right upper extremity weakness. (PSOF 43-44; Exhibit 10, page 45,

lines 9-11.).  He continued to have episodes of bowel and bladder control problems.  (Exhibit 18, page 2).

Plaintiff's condition had not improved, and on July 26, 2000, Dr. Sonntag and Dr. Theodore at the Barrow Neurological Institute of St. Joseph's Hospital, in Phoenix, again operated on Plaintiff.  They performed a C5-C7 laminectomy, which is a removal of the bone lamina off the back of the spinal canal.  Two disk spaces were decompressed this way, C5-C6 and C6-C7.  (PSOF 57.)  This was Plaintiff's sixth neck operation.  Plaintiff improved shortly after discharge, but again he did not get relief.  Today Plaintiff still suffers from the same type of symptoms, including weakness and numbness in his extremities and chronic pain in the neck; generally, "paralysis-legs and hands; pain."  He noted no improvement after the sixth surgery, and he continues to have bowel and bladder problems.  (Exhibit 13, page 97, lines 8-11; Exhibit 18, pages 2-4.)

Plaintiff filed his complaint on January 31, 2003.  Plaintiff retained one expert, Dr. Edward Smith, who is a surgical assistant in California.  (Exhibit 13, page 32. lines 8-14).  Dr. Smith is no longer a practicing surgeon (an "attending physician"), but since 1985 he has been a surgical assistant.  (Exhibit 13, pages 42-44; PSOF 62-65).  Dr. Smith testified at deposition that Dr. Weinand fell below the standard of care because "he did not adequately remove the osteophyte on the C6 vertebral body . . . [therefore] the spinal cord compression was not relieved because of significant amounts of the osteophyte remained."  (Exhibit 13, page 58, lines 18-21; Exhibit 13, page 60, lines 15-18).  Additionally, at deposition, Dr. Theodore (the

surgeon at the sixth operation) characterized Dr. Weinand's previous operation (the fifth) as "unsuccessful" and "inadequate."  Although he stated that "an inadequate decompression ... might be below the standard of care," he would not comment on whether the previous (fifth) operation fell below the standard of care.  (Exhibit 10, page 68, lines 21-24).

Defendant's expert, Dr. Philip Carter, is a retired Board Certified Neurosurgeon.  (PSOF 79, 82.)  Dr. Carter believed the fifth operation was successful and not below the standard of care, since the patient showed some improvement after the operation.  Also, Dr. Carter stated that it is common for some residual osteophyte to remain at the operation site after a decompression.  (PSOF 85-86.)

Regarding further harm from the fifth operation, Plaintiff's expert Dr. Smith claimed that Dr. Weinand's operation "did do further harm to [Endtricht], and that's the point of this lawsuit." (Exhibit 13, page 94, line 7 to page 95, line 7.)  When asked to elaborate, however, Dr. Smith admitted that Mr. Endtricht would not have necessarily gotten better ever after a full decompression:

> Q.   Is it your opinion that, despite achieving decompression [after the sixth surgery], Mr. Endtricht didn't get any better?
>
> A.   He got a little better.  He got improvement in his bowel and bladder function, and he got some benefit from pain, although not a lot, *and it didn't hold up*... [emphasis added]
>
> Q.   Is it your opinion, Doctor, that with any degree of medical certainty, that had Dr. Weinand fully removed the offending osteophyte, there would have been full decompression?
>
> A.   Yes...
>
> Q.   But it is not your opinion that he would have necessarily -- Mr. Endtricht would have necessarily gotten better?

A.      That's correct also.  (Exhibit 13, pages 82-83, lines 24-35 and lines 1-3.)
Furthermore, Plaintiff's expert Dr. Smith admitted that the risks of the operation included that
"the patient may lose not only strength and sensation, but may gain pain that they didn't have
before, or a pain that they already have may get worse."  (Exhibit 13, page 88, lines 7-10.)
Finally, Dr. Smith admitted that Plaintiff's problems after the sixth operation were the same
problems Plaintiff had after the fifth:

> Q.      But didn't [Endtricht] have similar problems following the [sixth] surgery,
> even if they were in a delayed fashion?
>
> A.      Yes, he did.  (Exhibit 13, page 97, lines 8-11.)

**DISCUSSION**

Standard of Review

A party is entitled to summary judgment when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with affidavits, if any, show that there is no
genuine issue as to any material fact and the moving party is entitled to a judgment as a matter
of law."  Fed. R. Civ. P. 56(c).  The moving party has the burden of showing no genuine issue
of material fact exists; if this burden is met, and the moving party has established that the other
party has failed to make a contrary showing sufficient to establish an essential element to his
case, the judge must grant the motion.  *United States v. Carter*, 906 F.2d 1375, 1377 (9th Cir.
1990).  The judge must determine whether there are "any genuine factual issues that properly
can be resolved only by a finder of fact because they may reasonably be resolved in favor of
either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  For an issue to be
"genuine," there must be enough evidence that a "reasonable jury" could reach a verdict in

favor of the nonmoving party.  *Id.* at 248.  Finally, in weighing a motion for summary judgment, the judge must draw all evidentiary inferences in the light most favorable to the non-moving party.  *See King County v. Rasmussen*, 299 F.3d 1077, 1083 (9th Cir. 2002). However, the "court need not draw *all* possible inferences in [the nonmoving party's] favor, but only all *reasonable* ones."  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F. 3d 1054, 1065 n. 10 (9th Cir. 2002).

Federal Tort Claims Act

This action arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b) and 2671 et seq.  Under the FTCA, the United States may be held liable for injury caused by the negligent act of an employee under circumstances where a private person would be liable to the claimant, under the law of the place where the act or omission occurred.  28 U.S.C. §1346(b), *See also Mundt v. U.S.*, 611 F.2d 1257 (9th Cir. 1980).  Therefore, we must examine the law of medical malpractice in Arizona.

Medical Malpractice

In Arizona, liability for medical malpractice is set by the Arizona Revised Statutes ("A.R.S."), Section 12-561 et seq.   Specifically, A.R.S. § 12-561(2) defines medical malpractice as follows:

> . . . an action for injury or death against a licensed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions, or breach of contract in the rendering of health care, medical services, nursing services or other health-related services or for the rendering of such health care, medical services, nursing services or other health-related services, without express or implied consent.

7

Plaintiff must establish certain elements of proof under A.R.S. § 12-563 to support a medical malpractice action:

> Both of the following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:
>
> 1. The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.
>
> 2. Such failure was a proximate cause of the injury.

Under these standards that control the situation, we turn to the merits of Plaintiff's claims.

First Issue:  Duty of Care

The first issue is whether summary judgment is appropriate regarding Dr. Weinand's duty of care.  In Arizona, the medical malpractice statute states that the accepted standard of care is:

> [the] degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.  A.R.S. § 12-563.

"The standard of care must be established by specific evidence.  It cannot rest on conjecture or inference." *Valencia v. United States*, 819 F.Supp. 1446, 1463-64 (D. Ariz. 1993).  When negligence is not apparent, a claimant must present expert evidence to establish this element. *Bell v. Maricopa Medical Center*, 157 Ariz. 192, 194-95 & n.1 (App. 1988).

Here Dr. Smith testified as an expert witness that in this particular case he believed that leaving the residual osteophyte fell below the standard of care because "the spinal cord compression was not relieved."  (Exhibit 13, page 60, lines 15-18).  Assuming arguendo that

8

Dr. Smith as a surgical assistant is a reasonable, prudent health care provider in the same profession, his expert testimony fulfills the statutory requirement for the duty of care.[2]  Also, Dr. Smith points to relevant, specific evidence to support his claim.  While Dr. Carter's testimony contradicts Dr. Smith's testimony, the former cannot overcome the latter as to the issue of summary judgment.  There is a genuine issue of material fact as to whether the accepted standard of care was met or not, and a reasonable jury could make a reasonable decision either way.  Thus summary judgment is not appropriate regarding the issue of duty of care.  However, even if there is a triable question regarding the duty of care, if Defendant shows summary judgment is proper on the issue of proximate cause, we must dismiss this case.

Second Issue:  Proximate Cause

The second issue is whether summary judgment is appropriate regarding Dr. Weinand's treatment of Endtricht as a proximate cause to any injuries Endtricht suffered.

To show proximate cause, Plaintiff must prove that a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, produced the injury, in whole or in part, and without which the injury would not have occurred.  *Barrett v. Harris*, 207 Ariz. 374, 378 (App. 2004).  Mere unsuccessful treatment will not give rise to negligence.  *Gaston v. Hunter*, 121 Ariz. 33, 50 (App. 1978).  Absent some negligence by the physician, there is no malpractice when the plaintiff suffers an adverse

---

[2] A possible issue for trial would be whether Dr. Smith in his capacity as a surgical assistant meets the Arizona statutory definition of a "reasonable, prudent health care provider in the profession or class to which he belongs," under A.R.S. § 12-563.

9

result which is an inherent risk of the procedure.  *Gaston*, 121 Ariz. at 50.  A court will generally defer to an expert's judgment on causality and not rule on summary judgment, since credibility decisions are not appropriate for summary judgment.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1207 (9th Cir. 1988).  However, a "court is not required to defer to the contrary opinion of [an] 'expert'" where the evidence clearly indicates the contrary.  *See In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1116 (9th Cir. 1989); *Robinson v. G. D. Searle & Company*, 286 F.Supp.2d 1216, 1218-20 (N.D. Ca. 2003).

Here Defendant argues there is no proximate cause; he argues there is no evidence that Dr. Weinand's treatment made Plaintiff Endtricht's condition worse.  While the Plaintiff's expert Dr. Smith claims there was proximate cause (the operation "did do further harm" to Plaintiff), Dr. Smith's own testimony in the deposition obviates this claim.  Dr. Smith admits that Endtricht's relief after the sixth operation "didn't hold up".  (Exhibit 13, pages 82-83, lines 24-35 and lines 1-3.)  He further admits that the relief after the sixth operation was fleeting, just like the relief after the fifth.  (Exhibit 13, page 97, lines 8-11.)  Finally, he admits that the patient would not necessarily have gotten better, and that a risk inherent to the operation is worse pain or numbness.  (Exhibit 13, pages 82-83, lines 24-35 and lines 1-3.)  Most importantly, Dr. Smith does not point to any damage or injury which he can link to Dr. Weinand's operation as a proximate cause.  There is no adverse risk, injury, or worsened condition that was not a risk of the operation.  (See Exhibit 18, pages 2-4.)  Plaintiff also does not point to any evidence of injury that may come from a non-inherent risk but which is

similar to or may be confused with injury from an inherent risk.  Rather, the evidence presented shows that Plaintiff's condition remained the same from before the fifth operation to after the sixth operation.  Here Defendant as the moving party has made a showing that no genuine issue of material fact exists as to proximate cause; Dr. Weinand caused no additional injury to Endtricht.  Plaintiff as the nonmoving party has failed to make a contrary showing sufficient to establish proximate cause.  Hence even if one draw's all evidentiary inferences in the light most favorable to Plaintiff as the non-moving party, as a matter of law, summary judgment is appropriate on the issue of proximate cause.

## CONCLUSION

This Court recommends that Defendant's Motion for Summary Judgment (Document # 95) be GRANTED.

Pursuant to Title 28 U.S.C. § 636(b), any party may serve and file written objections within 10 days of being served with a copy of this Report and Recommendation.  If objections are not timely filed, they may be deemed waived.  If objections are filed, the parties should use the following number:  CIV 03-073-TUC-RCC.

Dated this 29th day of September, 2006.


Bernardo P. Velasco
United States Magistrate Judge

11